**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| LINDA K. MERLING, MYLES MERLING, BRUCE D. BELFER, MARC BELFER, BENJAMIN RAUCHER, ELAINE BELFER-RAUCHER, | : : : : | |
| Plaintiffs, | : : | **OPINION** |
| v. | : : | Civ. No. 04-4026 (WHW) |
| HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY & SUSAN EPSTEIN | : : : : | |
| Defendants. | : | |
| HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY | : : : | |
| Third Party Plaintiff | : : | |
| v. | : : | |
| PHILIP GREEN, Ph.D. | : : | |
| Third Party Defendant. | : | |

**Walls, Senior District Judge**

In this Employee Retirement Income Security Act ("ERISA") action arising from the termination of plaintiffs' coverage under an employer-sponsored health plan, defendants Horizon Blue Cross Blue Shield of New Jersey and Susan Epstein move for summary judgment on all counts of plaintiffs' complaint. Plaintiffs Linda K. Merling, Myles Merling, Bruce D. Belfer, Marc Belfer, Benjamin Raucher, and Elaine Belfer-Raucher oppose and cross-move for summary judgment on Horizon's counterclaims. Pursuant to Fed. R. Civ. P. 78, the Court decides these motions without oral argument. The motions are granted in part and denied in part.

NOT FOR PUBLICATION

## FACTS AND PROCEDURAL HISTORY

Plaintiffs are employees/owners of two family-owned businesses, the Belfer Group and Lighting World, Inc. (collectively "BGI") and their family members.  (Defs.' Statement of Undisputed Facts ("Def. Facts") ¶¶ 1-3.)  Defendant Horizon Blue Cross Blue Shield of New Jersey ("Horizon") is an insurer who provided health care benefits to plaintiffs under the plan established by BGI (the "Plan").  (Id. ¶¶ 5-6.)  Defendant acts as both an administrator and payor of benefits.  (Def. Facts ¶¶ 6, 16; Pls.' Opp'n Br. at 17.)  Defendant Susan Epstein is an employee of Horizon in its Special Investigations Unit.  (Def. Facts ¶ 7.)  In 2004, she conducted a verification audit and investigation which led to the termination of plaintiffs' coverage under the Plan.  (Id. ¶¶ 4, 8.)

The Plan

The Plan covers medical treatment for recognized biologically-based mental illnesses and non-biologically based mental illnesses.  (Certification of Christine S. Orlando ("Orlando Cert.") Ex. A at 40-44, 55.)  The Plan defines a biologically-based mental illness as "a mental or nervous condition that is caused by a biological disorder of the brain" which results in a syndrome that substantially limits the person's ability to function.  (Id. at 14.)  A non-biologically based illness is defined as "a condition which manifests symptoms which are primarily mental or nervous, for which the primary treatment is psychotherapy. . . ."  (Id.)  The Plan limits benefits for non-biologically based illness to a 30-day annual maximum.  The Plan specifically excludes marriage, career, and financial counseling and any services covered by a social worker, except as specifically designated in the Plan.  (Id. at 78, 81.)  The Plan also excludes "telephone

NOT FOR PUBLICATION

consultations." (Id. at 82.)

The Plan permitted Horizon to terminate a participant's coverage for "[a]ny act or omission by a Covered Person which indicates intent to defraud [Horizon], such as the intentional and/or repetitive misuse of [Horizon]'s services or the omission or misrepresentation of a material fact on a[n] . . . application for enrollment, health statement or similar document." (Id. at 106.) Grounds for termination included "the submission of any claim and/or statement containing any materially false information, any information which conceals for the purpose of misleading, and/or any act which could constitute a fraudulent insurance act." (Id.)

Green's Treatment of Plaintiffs and Submission of Claims to Horizon

All plaintiffs reside in New Jersey and, from as early as 1998 to 2004, received psychiatric treatment from Philip S. Green, Ph.D., a licensed clinical social worker and marriage and family therapist located in California. (Id. ¶¶ 9-11.) Green provided counseling to plaintiffs primarily by telephone. (Def. Facts ¶ 11; Pls.' Counter-Statement of Facts ("Pls. Facts") ¶ 29.) Beginning in 2002, plaintiffs began seeking reimbursement from Horizon for the psychiatric services provided by Green as "out of network" services. (Pls. Facts ¶¶ 31, 33, 39.) For each claim, plaintiffs attached a bill from Green using the Current Procedural Technology ("CPT") code 90806 to describe the services performed. (Def. Facts ¶ 38; Pls. Facts ¶¶ 23, 26.) A CPT code is a five-digit number that identifies and describes the services performed by the medical provider in accordance with a systematic listing published by the American Medical Association. (Def. Facts ¶ 39.) CPT code 90806 corresponds to "[i]ndividual psychotherapy, insight oriented behavior modifying and/or supportive, in an office or outpatient facility, approximately 45-50

-3-

NOT FOR PUBLICATION

minutes face-to-face with the patient." (Def. Facts ¶ 40.) Plaintiffs disclaim any knowledge of CPT codes. (Pls.' Response to Def. Facts ¶ 40.)

On encountering problems with processing of the initial claims, Elaine Belfer-Raucher spoke to a Horizon customer service representative. (Pls.' App. Ex. C ¶ 5.) The representative advised that Horizon had sent plaintiffs' claims to a California Blue Cross Blue Shield licensee for processing because of Green's location in California. (Id.) Belfer-Raucher explained that while Green was located in California, plaintiffs lived in New Jersey. (Id.) The representative instructed Belfer-Raucher to write on the back of the submission form, "See attached bills from Philip Green PhD [sic]. Do not sent [sic] to California. Please process in New Jersey as out of network provider." (Id.) The record is silent on whether Belfer-Raucher explained to the customer service representative the nature of the treatment or that it was being provided over the phone. Horizon processed and reimbursed plaintiffs for these claims as well as several hundred additional claims for Green's services until April 2004. (Pls. Facts ¶ 40.) The total amount of the reimbursements was approximately $100,000. (Def. Facts ¶ 42.)

The Audit

In Spring 2004, Horizon conducted an audit of plaintiffs' claims. (Def. Facts ¶ 8.) By letters dated May 17, 2004, Horizon informed each plaintiff that reimbursement for the claims was improper, and that the CPT code used on Green's bills misrepresented the type of treatment provided to plaintiffs. (Id. ¶¶ 44-50.) Defendants admonished that "[i]f these services had been accurately represented, Horizon . . . would not have issued any benefit payment." (Id. ¶ 47.) A "claim block" was placed on all claims submitted by plaintiffs, not just the claims in dispute. (Id.

-4-

NOT FOR PUBLICATION

¶ 49.)  Defendants demanded reimbursement for Horizon's payments within 10 days and invited plaintiffs to submit documentation that they received "face-to-face therapy in an office or outpatient setting."  (Id. ¶¶ 48, 50.)

Plaintiffs did not respond within 10 days, but assert that they sent Horizon a letter on June 28, 2004 requesting review of the decision to deny benefits and citing ERISA provisions allegedly violated by defendants.  (Pls. Facts ¶¶ 86-89.)  Defendants alternately claim that they never received this letter or received it belatedly.  (Def. Facts ¶ 51.)  On July 14, 2004, Horizon informed each plaintiff by letter that, having received no response to its May 17 letter, Horizon had terminated their coverage.  (Id. ¶ 52.)  Plaintiffs sent two more letters to Horizon requesting, among other things, review of its decision to terminate plaintiffs' coverage.  (Pls. Facts ¶¶ 100, 102, 104-105.)  Defendants did not respond to these letters.  (Id.)

On August 20, 2004, plaintiffs filed this action alleging ERISA violations, breaches of fiduciary duty, contract, of the implied covenant of good faith and fair dealing, and "estoppel, waiver and laches."  Plaintiffs moved for a preliminary injunction ordering Horizon to restore their coverage under the Plan.  The Court denied the motion.  Horizon then impleaded Philip Green, Ph.D. as a third party defendant.  On January 22, 2007, the Court denied Green's motion for summary judgment.  Defendants now move for summary judgment on all counts of plaintiffs' complaint.  Plaintiffs oppose and cross-move for summary judgment on Horizon' counterclaims.

**NOT FOR PUBLICATION**

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute between the parties will not defeat a motion for summary judgment unless it is both genuine and material. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S. Ct. 2505 (1986). A factual dispute is material if, under the substantive law, it would affect the outcome of the suit, and it is genuine if a reasonable jury could return a verdict for the non-moving party. See Anderson, 477 U.S. at 248. The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986).

Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts" in question. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348 (1986). To survive a motion for summary judgment, the non-moving party must present "more than a scintilla of evidence showing that there is a genuine issue for trial." Woloszyn v. County of Lawrence, 396 F.3d 314, 319 (3d Cir. 2005). The non-moving party must go beyond the pleadings and, by affidavits or other evidence, designate specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Celotex, 477 U.S. at 323-24. "Conclusory statements, general denials, and factual allegations not based on personal knowledge [are]

-6-

NOT FOR PUBLICATION

insufficient to avoid summary judgment." Olympic Junior, Inc. v. David Crystal, Inc., 463 F.2d 1141, 1146 (3d Cir. 1972).

At the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. See Anderson, 477 U.S. at 249. In doing so, the court must construe the facts and inferences in the light most favorable to the non-moving party. See id. at 255; Curley v. Klem, 298 F.3d 271, 276-77 (3d Cir. 2002).

**DISCUSSION**

**I.     The HIPAA Claim**

Defendants seek dismissal of plaintiffs' claim under Health Insurance Portability and Accountability Act ("HIPAA"), 42 U.S.C. §1320d-6, on the ground that HIPAA does not provide a private right of action. Plaintiffs' opposition brief is silent on this issue. The Court deems the HIPAA claims as abandoned.[1] See Taylor v. City of New York, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way."). Insofar as plaintiffs allege a HIPAA claim, that claim is dismissed.

_____

[1] In any case, there is no private right of action under HIPAA. Although the Third Circuit has not addressed whether HIPAA creates a private right of action for violations of confidentiality, the federal courts that have considered this question have consistently held that it does not. See, e.g., Acara v. Banks, 470 F.3d 569, 571-72 (5th Cir. 2006); Agee v. U.S., 72 Fed. Cl. 284, 289-90 (Fed. Cl. 2006); Runkle v. Gonzales, 391 F. Supp. 2d 210, 237-38 (D.D.C. 2005) (explaining that no federal court has found private right of action under HIPAA); Johnson v. Quander, 370 F. Supp. 2d 79, 99-100 (D.D.C. 2005) (same); Univ. of Co. Hosp. Auth. v. Denver Pub. Co., 340 F. Supp. 2d 1142, 1144-45 (D. Colo. 2004) (examining HIPAA's statutory language and structure in holding no private remedy exists).

NOT FOR PUBLICATION

**II.   Damages Action Against Susan Epstein Under ERISA**

Defendant Susan Epstein moves for summary judgment on plaintiffs' ERISA claims against her on the ground that section 502(a) of ERISA, 29 U.S.C. § 1132(a), does not authorize an action for damages against individual employees of an insurer. (Defs.' Br. at 13.) Plaintiffs oppose Epstein's motion claiming that their claims against Epstein are not in her capacity as a mere employee but as a plan fiduciary who "may be liable for breaches of duty to the plan beneficiaries." (Pl. Opp. Br. at 33.) Although plaintiffs exert much effort in portraying Epstein as a plan fiduciary, they cite no case in which a fiduciary of a plan was held personally liable to the plan beneficiaries. (Id. at 33-37.) They cannot because ERISA does not provide for such relief.

Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2), authorizes private suits by plan participants to obtain "appropriate relief" under section 409 of ERISA, 29 U.S.C. § 1109. Section 409 of ERISA reads:

> a fiduciary *with respect to a plan* who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to *make good to such plan* any losses to the plan resulting from each such breach, and *to restore to such plan* any profits of such fiduciary which have been made *through use of assets of the plan* by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

ERISA § 409(a), 29 U.S.C. § 1109(a) (emphasis added).

The plain language of section 409 provides that a recovery for violations of this section "inures to the benefit of the plan as a whole" rather than to the individual beneficiary. Massachusetts Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 140, 105 S. Ct. 3085 (1985). See also

NOT FOR PUBLICATION

Walter v. Int'l Ass'n of Machinists Pension Fund, 949 F.2d 310, 317 (10th Cir. 1991) (fiduciary who breaches duty is liable to plan, not to individual beneficiaries); Kessen v. Plumbers' Pension Fund, Local 130, 877 F. Supp. 1198, 1205 (N.D. Ill. 1995) (liability for breach of fiduciary duty under section 409 runs only to plan and not to individual).  The Supreme Court has further held that the catchall remedy clause providing for "equitable or remedial relief" does not offer a right of action to an individual beneficiary to recover extracontractual damages.  See Massachusetts Mut. Life Ins. Co., 473 U.S. at 140-144.  In Massachusetts Mutual Life, the Supreme Court reversed the lower court's interpretation of section 409 to permit the recovery of compensatory and punitive damages by the individual beneficiary.  See id. at 140-144, 148.  Finding that the language of section 409 focused on the fiduciary relationship between the fiduciary and the plan as an entity, and inferring from it that Congress did not intend that section to provide for any relief except for the plan itself, the Supreme Court held that the section did not provide authority to award extracontractual damages to a beneficiary.  See id.

Plaintiffs' complaint here seeks individual relief rather than plan-wide relief.  (Compl. Demand Clause).  Plaintiffs' exposition regarding Epstein's status as a fiduciary is ultimately futile because plaintiffs cannot maintain their damages action against Epstein under sections 502(a) and 409 of ERISA even if she were a fiduciary.  The only other section which could permit plaintiffs to bring a breach of fiduciary duty claim against Epstein does not support a damages remedy.  See ERISA § 502(a)(3); 29 U.S.C. § 1132(a)(3) (providing injunctive and equitable remedies); Mertens v. Hewitt Assocs., 508 U.S. 248, 257-58, 113 S. Ct. 2063 (1993) (money damages, a classic form of legal relief, are not available under section 502(a)(3)).

NOT FOR PUBLICATION

Plaintiffs have pointed to no other provision authorizing recovery of damages from Epstein under ERISA.  The ERISA damages claim against Epstein is dismissed with prejudice.

## III.   ERISA Claims

Horizon asks the Court to enter summary judgment on the remaining ERISA claims because plaintiffs have failed to establish that Horizon abused its discretion in terminating coverage under the Plan.  Plaintiffs oppose.

### A.      Standard of Review

When evaluating challenges to denials of benefits in actions brought under 29 U.S.C. § 1132(a)(1)(B), district courts are to review the plan administrator's decision under a de novo standard of review unless, as here, the "plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S. Ct. 948 (1989).  In the latter case, a deferential standard of review applies.  See id.  Plaintiffs do not dispute that the applicable standard of review in this case is the arbitrary and capricious standard.  (Pls.' Opp. Br. 16-20.)  If the plan administrator with discretionary authority "is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion." Id. (alteration omitted).

Before the Supreme Court's decision in Metropolitan Life Ins. Co. v. Glenn, __ U.S. __, 128 S. Ct. 2343 (2008), the circuits were split on whether the fact that a plan fiduciary assumes a dual role, that is, it both evaluates the claims for benefits and pays for benefits, creates a conflict of interest that must be weighed as a factor in judicial review of the administrator's decision.  See

-10-

**NOT FOR PUBLICATION**

Post v. Hartford Ins. Co., 501 F.3d 154, 161 (3d Cir. 2007) (noting the circuit split).  The Third

Circuit was among the majority of circuits holding that the dual role does present a conflict of

interest and applied a "sliding scale" of scrutiny according to the nature and degree of the

conflict.  See id. at 161-62.  In Metropolitan Life, the Supreme Court, while agreeing that the

plan administrator's dual role presents a conflict of interest, rejected the heightened level of

scrutiny employed by the majority of the circuits.  See Metropolitan Life, 128 S. Ct. at 2350.  The

Court explained:

> We do not believe that Firestone's statement [regarding the conflict] implies a
> change in the standard of review, say, from deferential to de novo review.  Trust
> law continues to apply a deferential standard of review to the discretionary
> decisionmaking of a conflicted trustee, while at the same time requiring the
> reviewing judge to take account of the conflict when determining whether the
> trustee, substantively or procedurally, has abused his discretion.  We see no reason
> to forsake Firestone's reliance upon trust law in this respect.

Id. (internal citations and emphasis omitted).  The Court further held that it was not "necessary or

desirable" for courts to create special evidentiary, procedural or burden of proof rules to account

for the conflict of interest and that "conflicts are but one factor among many that a reviewing

judge must take into account."  Id. at 2351.

After Metropolitan Life, the majority of circuits, including the Third, have abandoned the

"sliding scale" approach as no longer valid.  See Estate of Schwing v. Lilly Health Plan, 562 F.3d

522, 525-26 (3d Cir. 2009) (surveying decisions after Metropolitan Life).  The district courts

must now apply a deferential standard of review and consider any conflict of interest as one of

several factors in deciding whether the administrator or fiduciary has abused its discretion.  See

id.  An administrator's decision must be affirmed unless it was "without reason, unsupported by

**NOT FOR PUBLICATION**

substantial evidence or erroneous as a matter of law." Abnathya v. Hoffman-LaRoche, Inc., 2

F.3d 40, 45 (3d Cir. 1993). Metropolitan Life leaves undisturbed this Circuit's rejection of the

so-called "after-acquired evidence." In reviewing whether the administrator has abused its

discretion, the court must generally limit its review to the "facts as known to the administrator at

the time the decision was made." See Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc. Employee

Health and Welfare Plan, 298 F.3d 191, 199-200 (3d Cir. 2002) (quoting Levinson v. Reliance

Std. Life Ins. Co., 245 F.3d 1321, 1326 (11th Cir. 2001)). There are important exceptions to this

rule. A court may consider "evidence of potential biases and conflicts of interest that is not

found in the administrator's record." Kosiba v. Merck & Co., 384 F.3d 58, 67 n.5 (3d Cir. 2004)

(internal citations omitted). Additionally, "where the evidence outside the administrative record

is related to interpreting the plan or explaining medical terms and procedures relating to the

claim," it may be considered by a court. See O'Sullivan v. Metro. Life Ins. Co., 114 F. Supp. 2d

303, 310 (D.N.J. 2000) (citing Vega v. Nat'l Life Ins. Servs., Inc., 188 F.3d 287, 299 (5th Cir.

1999)); see also Epright v. Envtl. Res. Mgmt., 81 F.3d 335, 339 (3d Cir. 1996).

    **B.**    **Analysis**

    Two issues must be considered here: First, whether Horizon was arbitrary and capricious

in determining that the treatments provided by Green ("Green Claims") were not covered under

the Plan; and second, whether Horizon's termination of plaintiffs' coverage was arbitrary and

capricious.

    *1.*    *Whether the Green Claims Were Covered Under the Plan*

    Horizon argues that it was not arbitrary and capricious in determining that the Green

**NOT FOR PUBLICATION**

claims were not covered because "telephone consultations" were specifically excluded under the Plan. Plaintiffs counter that psychotherapy provided over the phone does not fall within that exclusion because "consultation" involves an exchange between two or more medical personnel citing the definitions in Taber's Cyclopedic Medical Dictionary and Merriam-Webster's Collegiate Dictionary. Horizon responds that the meaning of "consultation" is not so narrow. "Consultation" is broadly defined by the Merriam-Webster's Collegiate Dictionary as "the act of consulting or conferring." Merriam-Webster's Collegiate Dictionay (11th ed. 2004). The term "consult" is defined as "to ask the advice or opinion of <~ a doctor>." Id.

Plaintiffs also argue that the term "consultation" is ambiguous at best and that when an ambiguity exists in the exclusionary language of the plan, a court must resolve ambiguities in favor of the insured. If this case were an ordinary insurance case or a case where the court's review of the administrator's decision were de novo, plaintiffs would be correct. The Court's review here, being a deferential one, is not so much to construe the terms of the Plan but to review Horizon's construction for abuse of discretion. While the Third Circuit has applied the rule of contra proferentem to determine the initial question of whether an ERISA plan granted discretion to the administrator, see Heasley v. Belden & Blake Corp., 2 F.3d 1249, 1257-58 (3d Cir. 1993), it has not addressed whether the principle is applicable in a review of an ERISA administrator's decision when the administrator has discretionary authority. See Ceccanechhio v. Cont'l Cas. Co., 50 Fed. Appx. 66, 73 (3d Cir. 2002) (noting Third Circuit's silence on the latter question and observing that other courts have concluded that the doctrine is inapplicable). District courts have held that "interpretation of ERISA benefit plans that give the plan

-13-

**NOT FOR PUBLICATION**

administrator discretionary authority to construe the terms of the plan does not follow the

principle of <u>contra</u> <u>proferentem</u>." <u>Fahringer v. Paul Revere Ins. Co.</u>, 317 F. Supp. 2d 504, 519

(D.N.J. 2003); <u>Doe v. Hartford Life and Accident Ins. Co.</u>, No. 05-2512, 2008 WL 5400984, at

*4 (D.N.J. Dec. 23, 2008); <u>accord</u> <u>Morton v. Smith</u>, 91 F.3d 867, 871 n.1 (7th Cir. 1996) ("In

making a deferential review of [an administrator's interpretations of the plan's terms], courts

have no occasion to employ the rule of <u>contra</u> <u>proferentem</u>."). The Court finds the reasoning of

these cases persuasive and holds that the rule does not apply here.

Horizon's application of the "telephone consultation" exclusion to the Green Claims was

supported by its common and ordinary meaning. Under the deferential standard and allowing the

conflict of interest its appropriate weight, defendant's determination was neither unreasonable

nor erroneous as a matter of law. Summary judgment is granted to Horizon on this issue.

> 2. *Whether Horizon's Decision to Terminate Was Arbitrary*

Determining whether Horizon's decision to terminate plaintiffs' participation in the Plan

was arbitrary and capricious requires an examination of the relevant record. Horizon's stated

ground for termination was plaintiffs' alleged fraud. Defendant asserts that plaintiffs committed

fraud by submitting claims with CPT code 90806, which stood for face-to-face sessions, when a

great majority of the sessions was conducted over the phone.[2] The question for the Court, then,

is whether there was substantial evidence of plaintiffs' fraud. If so, the Court may not substitute

---

[2] Although Horizon also claims that plaintiffs also misrepresented the conditions Green treated, defendant appears not to have relied on this alleged misrepresentation in deciding to terminate. Because the Court's review is limited to the evidence known to Horizon at the time the decision was made, the Court cannot consider this proffered ground for termination.

**NOT FOR PUBLICATION**

its own judgment for that of the administrator in determining whether a fraud occurred.  See

Abnathya, 2 F.3d at 45.

Under the Plan, Horizon had the right to immediately terminate a participant's coverage

for  "[a]ny act or omission . . . which indicates intent to defraud [Horizon], such as the

intentional and/or repetitive misuse of [Horizon]'s services or the omission or misrepresentation

of a material fact on . . . a[n] application for enrollment, health statement or similar document, as

Determined by [Horizon] . . . ."  The grounds for termination included the "submission of any

claim and/or statement containing any materially false information, any information which

conceals for the purpose of misleading, and/or any act which could constitute a fraudulent

insurance act."  Although Horizon argues that the Plan does not require proof of intentional fraud

before termination, the termination provision included words of intent or knowledge in defining

fraud, as did Horizon's internal documents.  Horizon's Health Care Fraud Prevention and

Detection Manual explicitly defined fraud as "the knowing misrepresentation of any material fact

. . . or the knowing failure to disclose any material fact in a claim . . . which, if properly revealed

or disclosed . . . could affect the payment of a claim."  (Pls.' App. Ex. V.)  In addition, Epstein,

the principal decisionmaker in this case, defined fraud as the "intentional misrepresentation of a

fact in order to gain a benefit to which you are not entitled."  (Pls.' App. Ex. I, 56:8-16.)  As

noted, the Court may consider evidence outside the administrative record to interpret the terms of

the Plan.  See O'Sullivan, 114 F. Supp. 2d at 310.  Because Horizon's internal procedures

defined fraud as knowing misrepresentation and Horizon's primary investigator purportedly

applied that definition in this case, Horizon's decision to terminate will only be affirmed if it had

**NOT FOR PUBLICATION**

substantial evidence of knowledge.[3]

Epstein's report recounts the following actions taken by defendants to investigate

plaintiffs' alleged fraud:

1. Horizon's claims processing unit referred plaintiffs' claims to Epstein, noting that "subscribers who were employed by a New Jersey business [were] receiving extensive treatments from a California psychologist."  (Pls. Facts ¶ 50.)

2. The utilization review showed that plaintiffs each had submitted a large number of claims from Green: Bruce Belfer, 172 claims from 1/3/01-3/23/04; Marc Belfer, 206 claims from 10/10/00 to 3/24/04; Linda Merling, 287 claims from 1/3/00 to 3/29/04; Myles Merling, 117 claims from 9/7/00 to 3/30/04; Elaine Belfer-Raucher, 347 claims from 9/1/00 to 2/25/04; Benjamin Raucher, 203 claims from 11/14/01 to 3/31/04.  (Pls.' App. Ex. Q.)

3. As the numbers of the claims and the CPT code indicating in-office visits suggested to Epstein that plaintiffs spent a significant time in California receiving treatments from Green, Epstein visited BGI, plaintiffs' place of business in New Jersey, on May 4, 2004 to verify their employment with BGI.  (Id.)

4. During the visit, Epstein learned that Bruce Belfer, Marc Belfer, Linda Merling and Elaine Belfer-Raucher were owners of BGI and that Myles Merling and Benjamin Raucher were dependents of the latter two owners.  She also learned that BGI had no offices in California and that none of the owners traveled regularly to California.  (Id.)

_____

[3]  In a footnote, Horizon contends that it was entitled to terminate and rescind coverage even in the absence of specific authority in the Plan and without evidence of actual intent to deceive, citing Allstate Ins. Co. v. Meloni, 98 N.J. Super. 154, 236 A.2d 402 (App. Div. 1967). Generally, the equitable remedy of rescission is available to insurers only for material misrepresentations on an insurance *application*.  See Rutgers Cas. Ins. Co. v. LaCroix, 194 N.J. 515, 528, 946 A.2d 1027 (2008).  The alleged misrepresentations here were not on an insurance application.  Even so, the New Jersey Supreme Court has approved the grant of the equitable remedy of rescission when the insurance contract includes a provision allowing for rescission for misrepresentations outside the insurance application.  See Longobardi v. Chubb Ins. Co. of N.J., 121 N.J. 530, 539, 582 A.2d 1257 (1990).  In such case, rescission is only permitted when the misrepresentation is knowing and material.  See id. at 540 (citing cases).  Consequently, Horizon cannot avoid the requirement of proving knowledge even under its rescission theory.

**NOT FOR PUBLICATION**

5.      Epstein learned that her colleague, Judy Beinstock, spoke with BGI's insurance broker who advised that plaintiffs "had gone to California to receive the services, and the doctor had come to New Jersey to receive the services." (Pls.' App. Ex. I at 113:10-13.)

6.      Epstein spoke with Marc and Bruce Belfer on May 5, 2004. Both admitted that at least some, if not the majority, of the claims for reimbursements were for psychotherapy session provided over the phone. (Pls.' App. Ex. Q, Ex. X at 12:16-24, 25:11-26:10.) Epstein also attempted to contact Linda Merling, Myles Merling, Elaine Belfer-Raucher, and Benjamin Raucher and left messages requesting that they return her calls. (Pls.' App. Ex. I at 92:11-94:22, Ex. Q; Ex. X. 20:7-22:15.)

7.      On May 17, 2004, Horizon informed each plaintiff by letter that reimbursement for the claims was improper, and that the CPT code used on the physician's bills misrepresented the type of treatment provided to plaintiffs. (Pls.' App. Ex. Q.) Horizon included a formal demand for reimbursement for Horizon's past payments to plaintiffs on the Green Claims within 10 days. (Def Facts ¶¶ 47-48.) A "claim block" was placed on all claims submitted by plaintiffs, not just the claims in dispute. (Id. ¶ 49.) Horizon invited plaintiffs to submit documentation that they received "face-to-face therapy in an office or outpatient setting." (Id. ¶ 50.)

8.      On July 14, 2004, Horizon sent plaintiffs another letter informing that, having received no response to its May 17 letter, Horizon had terminated their coverage. (Pls.' App. Ex. Q.)[4]

This record, viewed in the light most favorable to plaintiffs, does not disclose evidence of knowing or intentional misrepresentation. Although it is undisputed that the majority of plaintiffs' claims included a false statement in that the wrong CPT code was used, Horizon's

---

[4] Plaintiffs did not respond within 10 days, but assert that they sent Horizon a letter on June 28, 2004 requesting review of the decision to deny benefits and citing ERISA provisions allegedly violated by defendant. (Pls. Facts ¶¶ 86-89.) Epstein denies receiving this letter but acknowledges that a letter dated June 28, 2004 was received on July 20, 2004 by Horizon's in-house counsel. (Pls.' App. Ex. Q.) Plaintiffs sent two more letters to Horizon requesting, among other things, review of its decision to terminate plaintiffs' coverage. (Pls. Facts ¶¶ 100, 102, 104-105.) Horizon did not respond to these letters. (Id.)

NOT FOR PUBLICATION

investigation did not reveal substantial evidence that plaintiffs had knowingly used the wrong

CPT code in an effort to receive a benefit to which they were not entitled.  Plaintiffs have

consistently insisted that they had no knowledge of CPT codes and that they believed the

telephone therapy sessions to be covered under the Plan.  The only other evidence of specific

misrepresentation that Horizon can point to is Marc Belfer's statement that he had been out to see

Green on numerous occasions.  But Horizon had no reliable evidence to refute that statement

when it made the decision to terminate.  Even if it did, his alleged misrepresentation could not be

imputed to the rest of his family members to justify Horizon's finding of intentional fraud as to

all of them.  Horizon also faults plaintiffs for failing to respond to Epstein's calls and the May

17, 2004 letter.  Although a lack of response to repeated demands may raise an inference of

intentional concealment, plaintiffs assert that they did respond by letter dated June 28, 2004.

Horizon claims that it either never received the letter or received it belatedly.  Considering all the

evidence and resolving factual disputes in favor of plaintiffs, this Court cannot now find that

Horizon did not act arbitrarily.  Summary judgment on this issue is denied.

**IV.     Preemption of State Common Law Claims**

        Defendants move to dismiss plaintiffs' state law claims on the ground that they are

expressly preempted by ERISA.  Plaintiffs do not oppose but contend that Horizon's state law

counterclaims against plaintiffs are likewise preempted.[5]  (Pls.' Br. 42.)  Horizon, in turn, asserts

_____

        [5]  In its cross-moving papers, plaintiffs seemed to concede that Horizon's claims under
the New Jersey Insurance Fraud Prevention Act, N.J. Stat. Ann. § 17:33A-1, et seq., were not
preempted.  (Pls.' Br. 40-41.)  In the reply, however, plaintiffs impliedly retract that concession
and argue that all state law counterclaims asserted by Horizon are preempted, presumably

(continued...)

**NOT FOR PUBLICATION**

that its fraud and misrepresentation claims are not preempted by ERISA.[6]  The question

remaining for this Court, then, is whether Horizon's common law fraud and misrepresentation

claims are preempted by ERISA.

As the Third Circuit remarked, "[i]t is no secret to judges and lawyers that the courts have

struggled with the scope of ERISA preemption."  Kollman v. Hewitt Associates, LLC, 487 F.3d

139, 147 (3d Cir. 2007).  Few beacons clarify this complex area of law which, in the words of

our sister court has, "in the relatively brief period of its existence, come to earn the distinction as

our modern contender for high rank in the law's order of obscurity."  Atlantis Health Plan v.

Local 713, 258 F. Supp. 2d 284, 288 (S.D.N.Y. 2003).  No case advanced by the parties or

revealed through this Court's own research disposes of the questions presented in this case.

Accordingly, the Court's decision is guided by the legislative purpose behind ERISA and the

principles discerned from the opinions of the Supreme Court and the Third Circuit.

By enacting ERISA, Congress intended to provide a comprehensive and uniform

regulatory regime over employee benefit plans.  See Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41,

44, 107 S. Ct. 1549 (1987).  To further this goal, Congress included expansive preemption

---

[5](...continued)
including the Fraud Prevention Act claim.  (Pls.' Reply Br. 11.)  Because parties may not use the
reply to raise a new issue, the Court will not address plaintiffs' preemption argument with respect
to the Fraud Prevention Act claim.  See Bayer AG v. Schein Pharmaceutical, Inc., 129 F. Supp.
2d 705, 716 (D.N.J. 2001) (striking portions of reply brief that raised new issues for the first time
"because the local rules do not permit sur-reply briefs [and] a party opposing summary judgment
has no opportunity to respond to newly minted arguments contained in reply briefs.")

[6]  As Horizon has failed to respond to plaintiffs' preemption argument with respect to its
bad faith and unjust enrichment claims, it has abandoned them.  See Taylor, 269 F. Supp. 2d at
75.

-19-

NOT FOR PUBLICATION

provisions to ensure that employee benefit plan regulation would be "exclusively a federal

concern." Alessi v. Raybestos-Manhattan, Inc., 451 U.S. 504, 523, 101 S. Ct. 1895 (1981).

Hence, ERISA preempts any state law that relates to employee benefit plans. See ERISA, §

514(a), 29 U.S.C. § 1144(a). A state law "relate[s] to a benefit plan in the normal sense of the

phrase, if it has a connection with or reference to such a plan." Metropolitan Life Ins. Co. v.

Massachusetts, 471 U.S. 724, 739, 105 S. Ct. 2380 (1985) (internal quotation marks and citation

omitted). ERISA's preemptive scope "is not limited to 'state laws specifically designed to affect

employee benefit plans.'" Dedeaux, 481 U.S. at 47-48 (quoting Shaw v. Delta Air Lines, 463

U.S. 85, 98, 103 S. Ct. 2890 (1983)). It reaches "any state law cause of action that duplicates,

supplements, or supplant the ERISA civil enforcement remedy." Aetna Health, Inc. v. Davila,

542 U.S. 200, 209, 124 S. Ct. 2488 (2004) (citing Dedeaux, 481 U.S. at 54-56 and Ingersoll-

Rand Co. v. McClendon, 298 U.S. 133, 143-45, 111 S. Ct. 478 (1990)). State laws that regulate

insurance, however, are exempted from preemption under the saving clause. See ERISA, §

514(b)(2)(A), 29 U.S.C. § 1144(b)(2)(A).

        In Aetna Health, the Court held the plaintiffs' claims under the Texas Healthcare Liability

Act, which imposed a duty of ordinary care in the handling of coverage decisions, were

completely preempted by ERISA. See 542 U.S. at 214. Noting that ERISA's "integrated

enforcement mechanism, ERISA § 502(a) . . . [is] essential to accomplish Congress' purpose of

creating a comprehensive statute for the regulation of employee benefit plans," the Court held,

"any state-law cause of action that duplicates, supplements, or supplants the ERISA civil

enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy

-20-

**NOT FOR PUBLICATION**

exclusive and is therefore pre-empted." <u>Id.</u> at 209.  The Court explained that "Congress' intent to

make the ERISA civil enforcement mechanism exclusive would be undermined if state causes of

action that supplement the ERISA § 502(a) remedies were permitted, even if the elements of the

state cause of action did not precisely duplicate the elements of an ERISA claim." <u>Id.</u> at 216.  In

short, "if an individual, at some point in time, could have brought his claim under ERISA §

502(a)(1)(B), and where there is no other independent legal duty that is implicated by a

defendant's actions, then the individual's cause of action is completely preempted by ERISA §

502(a)(1)(B)." <u>Id.</u> at 210.

      <u>Aetna Health</u> concerned a state law claim brought by a plan beneficiary against the

insurer unlike this case in which the disputed state law claims are asserted by the insurer against

the beneficiaries.  This difference, however, is not dispositive because the preemption clause

does not distinguish between claims brought by the beneficiary or by the insurer.  The clause pre-

empts all state laws that relate to employee benefit plans.  <u>See</u> ERISA § 514(a), 29 U.S.C. §

1144(a).  Consequently, the claims asserted by the insurer are preempted if ERISA provides a

civil enforcement mechanism to the insurer against the beneficiaries and the actions complained

of implicate no other legal duty independent of ERISA or the terms of the plan.  <u>See</u> <u>Aetna</u>

<u>Health</u>, 542 U.S. at 210.

      While plaintiffs argue that Horizon could have pursued its negligent and fraud claims

under section 502(a), it does not point to any particular provision there.  As the Court reads it, the

only section that may be applicable is section 502(a)(3):

> A civil action may be brought - (3) by a participant, beneficiary, or *fiduciary* (A)
> to enjoin any act or practice which violates any provision of this title or the terms

NOT FOR PUBLICATION

> of the plan, (B) to obtain other appropriate equitable relief (i) to redress such
> violations or (ii) to enforce any provisions of this title or the terms of the plan.

ERISA, § 502(a)(3), 29 U.S.C. § 1132(a)(3) (emphasis added).  ERISA defines a fiduciary as any

person who "has any discretionary authority or discretionary responsibility in the administration

of such plan."  Horizon fits that definition.  Indeed, Horizon has insisted it exercises such

authority in support of its summary judgment motion to dismiss plaintiffs' ERISA claims.  It

follows that Horizon could have brought a claim under section 502(a) to remedy plaintiffs'

alleged violations of the Plan.

It is also clear that plaintiffs' potential liability derives entirely from the duties imposed

by the Plan.  For Horizon to prevail, it will need to prove that plaintiffs knowingly or negligently

misrepresented that the Green Claims were legitimate claims for benefits.  Whether the claims

were legitimate will depend on the interpretation of the Plan's terms.  That Horizon's

counterclaims are cast in labels such as fraud and negligence is irrelevant.  Their central issue is

were the Green Claims covered under the Plan.  In other words, interpretation of the Plan's terms

form an essential part of the counterclaims and the potential liability of plaintiffs/counter-

defendants "derives entirely from the particular rights and obligations established by" the Plan.

See Aetna Health, 542 U.S. at 213.

Horizon cites Horizon Blue Cross Blue Shield of N.J. v. Ahmad, No. 06-5730, 2007 WL

2265037, at *1 (D.N.J. Aug. 6, 2007) for the proposition that the mere fact that a plan's terms

may be consulted in the course of litigating a state-law claim does not require preemption of that

claim.  There, the court held that state fraud claims brought by the plan against a health service

provider were not preempted because the state law claims did not "encroach on the relationship

**NOT FOR PUBLICATION**

between beneficiary and the plan," nor "implicate ERISA-governed relationships."  Id. at *1-2.

The dispute involved the terms of the participation agreement between the plan and the health

care providers and an independent legal duty apart from the ERISA-governed benefit plan.  Id. at

*2.  That situation is much different from this case where plaintiffs' duty to present accurate

information derives from the obligations set forth in the Plan.[7]

In short, Horizon's counter-suit could have been pursued under the civil enforcement

section of ERISA, and the actions complained of implicate no legal duty independent of ERISA

or the Plan.  Horizon's common law fraud and negligence claims are completely preempted by

ERISA unless these causes of action fall under the saving clause for state laws regulating

insurance.  See ERISA 514(b)(2)(A); 29 U.S.C. § 1144(b)(2)(A).  There can be no serious doubt

that these state common laws do not "regulate insurance" and Horizon has not offered any

argument that they do.  Horizon's common law fraud and negligence claims against plaintiffs are

completely preempted.

**V.     New Jersey Fraud Prevention Act Claim**

Plaintiffs move for summary judgment on Horizon's claim under the New Jersey

Insurance Fraud Prevention Act ("IFPA"), N.J. Stat. Ann. § 17:33A-1, et seq., on multiple

grounds: that Horizon has no evidence to establish that plaintiffs acted with scienter and that

---

[7] Horizon's reliance on the Mackey v. Lanier Collection Agency & Serv., Inc., 486 U.S. 825, 108 S. Ct. 2182 (1988) (state garnishment law), and Painters of Phila. Dist. Council No. 21 Welfare Fund v. PriceWaterhouse, 879 F.2d 1146 (3d Cir. 1989) (state professional liability claim against plan's accountant/auditor for failure to uncover fraudulent activity by plan administrator), are equally unavailing as they concern state laws which did not relate to the administration of the plan unlike the present state law claims at issue.

**NOT FOR PUBLICATION**

Horizon has waived, or is estopped from asserting, this claim.

In response, Horizon first argues that the IFPA does not require a showing of scienter and that the term "knowingly" as used in the Act merely requires proof that the defendant provided objectively false information.  (Defs.' Opp'n at 16 (citing State v. Nasir, 355 N.J. Super 96, 105-06 (App. Div. 2002)).  In Nasir, the Appellate Division affirmed the grant of summary judgment against an insured under the IFPA despite his claim that he did not knowingly make any misrepresentation.  See 355 N.J. Super at 105-06.  The insured had falsely stated that he had not consulted a physician or practitioner in the past five years even though he had.  See id.  There, the court distinguished between "objective questions" and "subjective questions" and held that evidence of scienter is only required to prove misrepresentation of the latter.  See id.  Based on this holding, Horizon contends that it need not prove plaintiffs' knowledge of the CPT codes because the false information that plaintiffs supplied were "objective," in the sense that the falsity of the CPT codes can be objectively verified.  But that is not the definition of "objective" that the Appellate Division had in mind in Nasir.  The Nasir court explained, "[o]bjective questions call for information within the applicant's knowledge, 'such as whether the applicant has been examined or treated by a physician.'"  Id. (quoting Formosa v. Equitable Life Assur. Soc. of U.S., 166 N.J. Super. 8, 15, 398 A.2d 1301 (App. Div. 1979).  Although conceptually awkward, the Nasir court's distinction between objective and subjective questions makes sense: Because the definition of objective questions imports the element of knowledge, a plaintiff need not prove additional scienter to impose liability upon a defendant for insurance fraud.  As in Nasir, whether a person has been examined or treated by a physician is ordinarily information

-24-

NOT FOR PUBLICATION

within that person's knowledge.  In contrast, CPT codes and the meanings they represent are not

generally known to laymen such as these plaintiffs.  Unless Horizon has evidence that these

plaintiffs knew the meaning of CPT codes, its effort to shoehorn this case into <u>Nasir</u>'s holding is

futile.

       As to the other alleged misrepresentations, there remains a dispute of facts as to whether

plaintiffs were suffering from any covered mental illness or whether they received individual

psychotherapy.  As noted in Part III.B, <u>supra</u>, there also remains dispute of fact as to whether

plaintiffs knew that telephonic psychotherapy was not eligible for coverage.  There also remains

a dispute of fact on whether plaintiffs sought to conceal information during Epstein's

investigation.  Thus, summary judgment on this ground is inappropriate.

       There also remains a dispute of fact as to whether Horizon is equitably estopped from

disputing coverage or has waived its right to do so.  To support a claim of estoppel, a court must

weigh such factors as whether the insurer reasonably should have known about the mistake or

fraud at the time it made the payment.  <u>See</u> <u>New Jersey Manufacturers Ins. Co. v. Gonsalves</u>, 366

N.J. Super. 458, 480, 841 A.2d 512 (Law Div. 2003).  And to show waiver, plaintiffs must show

an "intentional relinquishment of a known right."  <u>See</u> <u>Van Allen v. Board of Comm'rs</u>, 211 N.J.

Super. 407, 410, 511 A.2d 1243 (App. Div. 1986).  Whether the payment of benefits for two

years by Horizon establish either of these claims is a material issue of fact inappropriate to

resolve on summary judgment.  The motion is denied.

## CONCLUSION

       Defendants' motion and plaintiffs' cross-motion for summary judgment are granted in

**NOT FOR PUBLICATION**

part and denied in part: HIPAA claim and ERISA damages claim against Epstein are dismissed with prejudice.  Horizon was not arbitrary and capricious in interpreting that the Green Claims are excluded under the "telephone consultation" exclusion.  Summary judgment is denied on the issue of whether Horizon abused its discretion in terminating plaintiffs' coverage.  Plaintiffs' state law claims are preempted.  Horizon's counterclaims, except for the IFPA claim, are preempted.  Summary judgment on the IFPA claim is denied.


            _____s/ William H. Walls_____
            United States Senior District Judge




**Appearances:**

Lawrence J. Sharon, Esq.
Victor Rivera, Jr., Esq. (of counsel)
Lebenfsfeld Borker Sussman & Sharon, LLP
140 Broad Street
Red Bank, New Jersey 07701
            Counsel for Plaintiffs Linda K. Merling, Myles Merling, Bruce D. Belfer, Marc
            Belfer, Benjamin Raucher, and Elaine Belfer-Raucher



Edward S. Wardell, Esq.
Christine S. Orlando, Esq.
Wardell, Craig, Annin & Baxter, LLP
41 Grove Street
Haddonfield, NJ 08033
            Counsel for Defendants Horizon Blue Cross Blue Shield of New Jersey and Susan
            Epstein